UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JAIME RODRIGUEZ,

                              Plaintiff,

v.                                                         9:10-CV-1013
                                                           (LEK/TWD)
JOHN MANENTI, D.O.,

                              Defendant.
_____

APPEARANCES:                          OF COUNSEL:

JAIME RODRIGUEZ
#34911-054
Plaintiff *Pro Se*
Fort Dix Federal Correctional Institution
Inmate Mail/Parcels
EAST: P.O. Box 2000
Fort Dix, New Jersey 08640

HON. RICHARD S. HARTUNIAN          KAREN FOLSTER LESPERANCE, ESQ.
Attorney for Defendants            Assistant U.S. Attorney
Office of the United States Attorney-Syracuse   James T. Foley U.S. Courthouse
P.O. Box 7189                      445 Broadway, Room 218
100 South Clinton Street           Albany, NY 12207
Syracuse, NY 13261-7198


## ORDER AND REPORT- RECOMMENDATION

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

        In this *pro se* prisoner civil rights action, commenced under *Bivens v. Six Unknown*

*Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), Plaintiff Jaime Rodriguez

claims that Defendant John Manenti, D.O. ("Defendant" or "Dr. Manenti") was deliberately

indifferent to his serious medical needs in violation of his constitutional rights under the Eighth

Amendment in refusing to authorize surgery on Plaintiff's left knee despite the recommendation

of contract orthopedic surgeons who had examined him.  Now before the Court are Plaintiff's

amended motion for summary judgment (Dkt. No 89), pursuant to Rule 56 of the Federal Rules

of Civil Procedure, and Defendant Manenti's motion for summary judgment.  (Dkt. No. 92.)  For

the reasons set forth herein, the Court recommends that Plaintiff's amended motion for summary

judgment be denied and Defendant's motion be granted.  The Court further recommends that

Plaintiff's Amended Complaint be dismissed as against any as yet unidentified Jane/John Doe

Defendants alleged to be members of the Northeast Region Utilization Committee, without leave

to amend, pursuant to 28 U.S.C. § 1915(e)(2)(B).

## I.    BACKGROUND

### A.    Diagnosis and Treatment of Plaintiff's  Left Knee Problems

Plaintiff sustained a gunshot wound to his left knee in 1991.  (Dkt. No. 37 at ¶ 16.)[1]  On

February 21, 2008, while confined at the Lewisburg Federal Penitentiary ("Lewisburg"), Plaintiff

saw physician assistant Ivan Navarro ("Navarro") for problems he had been having with the knee

since he heard a popping sound two or three months prior to the appointment.  *Id.*; Dkt. No. 92-5

at 42.  Navarro, noting that Plaintiff had a mild limp and complained of his knee locking while he

was walking, ordered x-rays, prescribed the nonsteroidal anti-inflammatory drug Naproxen, and

ordered a consult with Dr. Ball.  (Dkt. No. 92-5 at 42-43.)  The x-rays were taken on February

---

[1]  A plaintiff's verified complaint should be treated as an affidavit on a summary
judgment motion. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is
to be treated as an affidavit . . . and therefore will be considered in determining whether material
issues of fact exist . . . .") (citations omitted).  Plaintiff's Complaint in this case was properly
verified by declaration under 28 U.S.C. § 1746.  *See LeBoeuf, Lamb, Greene & MacRae, L.L.P.
v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury"
substantially complies with 28 U.S.C. §1746).

26, 2008. *Id.* at 48. The x-rays were negative except for degenerative joint disease. *Id.* at 49. Navarro informed Plaintiff of the results on March 12, 2008. *Id.* at 53.

Plaintiff was examined by Dr. Ball at the Ortho Clinic ("Ortho") on April 23, 2008. *Id.* at 55. The exam revealed limited flexion and extension and mild edema of Plaintiff's left knee. *Id.* at 56. Dr. Ball ordered an MRI for possible torn cartilage and directed that Plaintiff be seen in Ortho again after the MRI. *Id.* at 55. Ball made a provisional diagnosis of ACL/medial meniscal tear. *Id.* at 56. According to Plaintiff, Dr. Ball told him he needed arthroscopic surgery on the knee. (Dkt. No. 96-2 at ¶¶ 4-5.)

Plaintiff had an MRI on November 12, 2008. *Id.* at 59. The MRI revealed a small effusion, an artifact probably from the gunshot wound, in the medial patella femoral joint, and decreased thickness in the posterior patella cartilage. *Id.* The MRI also showed "considerable degenerative type abnormality in the medial knee joint compartment seen as loss of joint space, osteochondral irregularity and defects, osteophytes change, subchondral sclerosis and degenerative tears involving anterior and posterior horn of medial meniscus." *Id.* The cruciate and collateral ligaments, patella, and quadriceps tendon were intact. *Id.*

On February 12, 2009, after reviewing the MRI results, Navarro requested another consult for Plaintiff with an orthopedist. *Id.* at 61. At that time, Plaintiff was given a provisional diagnosis of tears involving the anterior and posterior horn of medial meniscus. *Id.* The referral to Ortho was approved on February 18, 2009. *Id.* at 63. However, on March 5, 2009, before being seen in Ortho, Plaintiff was transferred to FCI Ray Brook ("Ray Brook") where his medical record was reviewed on March 12, 2009. *Id.* at 65; *see also* Dkt. No. 37 at ¶ 21.

Plaintiff was examined by Ray Brook medical staff physician assistant Scott Liberty

("Liberty") on March 13, 2009. (Dkt. Nos. 37 at ¶ 21; 92-5 at 68-69.) Plaintiff claims that Liberty had no medical record of Plaintiff's current condition and refused to accept copies of Plaintiff's medical records. (Dkt. Nos. 37 at ¶ 21.) According to Plaintiff, Liberty determined upon physical observation that there was no foreign object in Plaintiff's knee and refused to issue any medication. *Id.* Plaintiff contends that it was only through the grievance procedure that he was able to obtain Naproxen and was scheduled to see a contract orthopedic surgeon. *Id.*

The medical records from Plaintiff's March 13, 2009, appointment with Liberty describe Plaintiff's subjective complaints as follows: "pt states that he is awaiting surgery on his left knee. Pt states that he had an MRI done in USP Lewisburg. pt states that he was on naproxen in past for pain but is not currently taking any meds. Has not purchased any Ibuprofen from commissary. pt had surgery on knee in 1991 for GSW to knee." (Dkt. No. 92-5 at 68-69.) Liberty noted his objective findings on examination as "Ecchymosis (no), Effusion (no), Warm to Touch (no), Decreased Range of Passive Motion (Yes), Crepitus (yes)." *Id.* Liberty's assessment was "[o]steoarthritis, localized, primary," with the additional notation "left knee considerable degenerative changes in medial knee joint." *Id.* Contrary to Plaintiff's claim that Liberty refused him pain medication, the record indicates that Liberty prescribed 500 mg Naproxen twice daily. *Id.* There is nothing in the medical record from Plaintiff's March 13, 2009, visit with Liberty suggesting that Liberty had reviewed the results of Plaintiff's MRI prior to seeing Plaintiff. *Id.* However, the record does indicate that Liberty requested a routine ortho consult for Plaintiff, follow-up at Chronic Care Clinic as needed, follow-up in 6 months, and placement of Plaintiff in the Ortho Clinic at Ray Brook in September of 2009. *Id.*

Plaintiff was transferred from Ray Brook to Brooklyn MDC on a federal writ on or about

4

April 10, 2009, and returned to Ray Brook on or about August 13, 2009. *Id.* at 71-74. Plaintiff

saw Liberty for his left knee problems on August 20, 2009, after his return to Ray Brook. *Id*. at

76. Liberty found Plaintiff's osteoarthritis unchanged and informed Plaintiff that he would be

put back on the list to see an orthopedist and that his prescription for Naproxen would be

renewed. *Id.* Liberty cautioned Plaintiff that surgery on his knee might not be approved by

regional. *Id.*

Plaintiff was examined by Ray Brook contract orthopedic surgeon Dr. Mina on

September 17, 2009. *Id*. at 79-80. Dr. Mina's notes from the examination describe Plaintiff's

history of pain, locking, and buckling of his left knee and reference the November 12, 2008, MRI

report. *Id*. at 80. Dr. Mina's provisional diagnosis was internal derangement and

chondromalacia of the left knee. *Id*. at 79. Dr. Mina recommended that Plaintiff have x-rays

taken (AP, lateral, and 2 obliques) with a follow-up appointment in October of 2009. *Id*. at 79.

Dr. Mina's notes include his opinion that Plaintiff would need arthroscopy. *Id*. at 80.

Plaintiff had a follow-up appointment with Dr. Mina on October 29, 2009, after the x-

rays had been taken. (Dkt. Nos. 37 at ¶ 23; 92-5 at 82.) The administrative note by Dr. Dawn

Marini requesting authorization for the arthroscopic surgery that had been recommended by Dr.

Mina, states in part that Dr. Mina had made a provisional diagnosis made of "tears of anterior

and posterior medial meniscus of left knee with possible loose osteochondral fragment." (Dkt.

No. 92-5 at 82.) The note referenced the findings from Plaintiff's November 12, 2008, MRI. *Id*.

According to Plaintiff, Dr. Mina explained the surgical procedure, telling him that he could

expect about an 80% reduction in his chronic arthritis pain, and that the knee jamming and

periods of extreme pain should be resolved. (Dkt. No. 37 at ¶ 23.) Dr. Mina told Plaintiff that

everything was in order, and the request for authorization for the surgery was submitted. *Id*.

B. **Disapproval of Arthroscopic Surgery Recommendation**

The request for authorization for arthroscopic surgery was received for consideration by Hyosim Seon-Spada ("Seon-Spada") on November 20, 2009. (Dkt. No. 92-5 at 85.) Seon-Spada is a commissioned officer in the United States Public Health Service and serves in the position of Regional Quality Improvement Coordinator. (Dkt. No. 92-6 at ¶ 1.) In her position, Seon-Spada receives requests for surgical authorization from the Bureau of Prison's ("BOP") Northeast Region, including the request for authorization for Plaintiff's arthroscopic surgery. *Id.* at ¶ 3. Seon-Spada reviews each consultation through the BOP's Electronic Medical Records System and inserts relevant information into InterQual®. *Id*. According to Seon-Spada, InterQual® is "an evidence-based software system used to help determine the appropriateness of care and related clinical decision-making, in avoiding medically unnecessary care." *Id*. If the InterQual® criteria for a specific consultation request are met, Seon-Spada approves the request. If not, the consultation request is forwarded to the Regional Medical Director ("RMD") for final decision making. *Id*.

Seon-Spada found that the InterQual® criteria were not met with respect to the November 29, 2009, request for Plaintiff's knee surgery because "Plaintiff had not exhausted all conservative treatment options, namely, more than 6 weeks of physical therapy," and denied the request. *Id*. at ¶ 4; Dkt. No. 92-5 at 85. After denying the request, Seon-Spada sent it to Defendant, RMD for the Northeast, for review. (Dkt. Nos. 92-5 at 85; 92-6 at ¶ 4.) Defendant disapproved the request for arthroscopic surgery. (Dkt. No. 92-5 at 85.) The InterQual® Review Summary states his reason for disapproval as incomplete clinical management. *Id*. Plaintiff's

medical records, including the MRI report, were available for Defendant's review, and he reviewed those records and the InterQual® Procedures in reaching his decision to deny the recommended knee surgery.[2]  (Dkt. Nos. 89-2 at ¶¶ 11-12; 92-6 at ¶¶ 8, 10 & 23.)  According to Defendant, when all of the facts related to plaintiff's condition were compared against all the necessary criteria to be weighed under the Interqual® Procedures, Plaintiff's request for surgery did not meet all the InterQual® criteria in December 2009.  (Dkt. No. 96-2 at ¶ 23.)  Defendant admits the denial was based primarily on the failure to exhaust conservative treatment measures, but at the same time contends that the InterQual® Procedure was only one part of his review process.  (Dkt. No. 89-2 at ¶¶ 11-12.)  Defendant has acknowledged making the final decision denying Plaintiff surgery on his knee.  (89-2 at ¶ 5.)

Plaintiff filed a request for an administrative remedy from Defendant's denial with then Ray Brook Warden, Deborah Schult, on December 4, 2009. (Dkt. No. 92-5 at 18-20.)  The request was denied.  *Id*. at 21.  Plaintiff appealed the denial.  *Id*. at 23-27.  The appeal was denied by Regional Director, J.H. Norwood ("Norwood").  *Id*. at 28.  According to Norwood, he had been advised by medical staff that Plaintiff was "receiving appropriate treatment, and continue[d] to have access to sick-call."  *Id*.  Plaintiff's Central Office Administrative Remedy Appeal was denied by Harrell Watts ("Watts"), Administrator National Inmate Appeals.  *Id*. at 29-31.

---

[2]  Plaintiff and Defendant have both relied upon Defendant's Response to Plaintiff's First Set of Interrogatories (Dkt. Nos. 89-2; 92-6) in support of their respective positions on the summary judgment motion before the Court.  Defendant's interrogatory responses were not signed under oath as required by Rule 33(b)(3) of the Federal Rules of Civil Procedure.  Since Plaintiff has not moved to strike or otherwise objected to Defendant's submission of arguably inadmissible evidence and has, in fact, relied upon that evidence himself, the Court deems objections to admissibility of the responses to have been waived. *See DeCintio v. Westchester County Medical Center*, 821 F.2d 111, 114 (2d Cir.) (admissibility objections are waived if no motion to strike is made, especially where both sides have relied upon unsworn papers).

Defendant played no role in the investigation of, or response to, Plaintiff's appeal to the Northeast Regional Director or the Central Office appeal, nor was Defendant ever contacted by the Central Office Health Services Division with regard to Plaintiff's Central Office appeal.[3] (Dkt. No. 89-2 at ¶¶ 13-19.)

### C. Plaintiff's Medical Treatment Following Manenti's Denial

On August 26, 2010, more than six months after the denial of surgery, Plaintiff suffered an episode of jamming, extreme pain, and swelling in his knee. (Dkt. No. 37 at ¶ 31.) He attended the next available sick call sign up on August 27, 2010, and was given an appointment for August 31, 2010, at which time he saw physician assistant Richard Jensen ("Jensen"). *Id.* After looking at Plaintiff's medical records, Jensen told him there was nothing else that could be done and suggested he pursue the matter through a grievance. *Id.* at ¶ 32. When Plaintiff asked Jensen about Naproxen, he told him prisoners were now required to purchase Naproxen themselves. *Id.;* Dkt. No. 96-3 at 49.

Plaintiff spoke to Kim Burdo ("Burdo"), the Health Services Administrator at Ray Brook on October 18, 2010, in an attempt to find out the names of the individuals on the Northeast Regional Utilization Committee. *Id.* at 50. Burdo did not give Plaintiff the names but did tell him he needed to come in for sick call to determine the next step in his care. *Id.* There is

---

[3] Paragraph 49 of Defendant's Statement of Material Facts submitted in support of his motion for summary judgment, states that "Dr. Manenti had no further involvement in decisions regarding Plaintiff's medical care after his secondary review of the request for surgery in December 2009." (Dkt. No. 92-3 at ¶ 49.) Manenti references Exhibit S to his motion papers as support for the statement. *Id.* Exhibit S, Defendant's Response to Plaintiff's First Set of Interrogatories, appears to show only that Defendant was not involved in the grievance appeals process, not that he had no further involvement in decisions regarding Plaintiff's medical care. (*see* Dkt. No. 89-2.) However, the Court has found no evidence in the summary judgment record of further involvement in decisions regarding Plaintiff's medical care by Defendant.

nothing in Plaintiff's medical records indicating that he followed Burdo's instruction to come in for sick call. In fact, Plaintiff did not go to sick call again until December 17, 2010. (Dkt.

On December 17, 2010, Plaintiff saw nurse practitioner Catherine Gore ("Gore"). (Dkt. No. 92-6 at 45.) Upon examination of Plaintiff's knee, Gore found swelling and tenderness with decreased range of active motion; clicking, popping, and locking; and medial meniscus tenderness. *Id.* Gore's assessment of Plaintiff's knee was worsened chronic unspecified derangement of medial meniscus. *Id.* Gore requested new x-rays and another MRI of Plaintiff's left knee, along with a consult with an orthopedist. *Id*. at 46. Gore gave Plaintiff range of motion exercises. *Id*. at 46. X-rays were done on January 19, 2011. (Dkt. No. 96-3 at 51.)

A second request for authorization for a surgical repair of what was identified in the second InterQual® Review Summary as an unstable meniscal tear with knee locking was approved by Seon-Spada on February 23, 2011. (Dkt. No. 92-6 at 48.) On April 25, 2011, upon learning that he was being transferred from Ray Brook, Plaintiff asked Burdo for a medical hold to allow him to stay at Ray Brook for his surgery. (Dkt. No. 37 at ¶ 38.) Burdo declined and told Plaintiff the surgery would be done at his new institution, FCI Fort Dix ("Fort Dix"). *Id*. Plaintiff was transferred on April 29, 2011. *Id*.

On May 12, 2011, Plaintiff went to sick call at Fort Dix and was told he would have to start the process for the surgery all over again. (Dkt. No. 96-3 at 53.) However, when Plaintiff went to sick call again on May 18, 2011, he saw Jose Ravago, MLP, who noted that Plaintiff had already been approved for surgery. (Dkt. No. 92-6 at 57.) On May 26, 2011, Plaintiff saw orthopedic surgeon Dr. Winfield Williams, who told Plaintiff he would request a new MRI to see if there had been changes since the original MRI in 2008 before doing the surgery. *Id*. A request

was submitted for a new MRI on or about June 6, 2011.  *Id*. at 54.

On June 9, 2011, Plaintiff was seen by orthopedist Dr. Ronald S. Glick.  *Id*. at 52.  In his Consultation Report, Dr. Glick described his impression of Plaintiff's knee problems as "1. Tear of the medial meniscus, left.  2. Degenerative arthritis, left knee, secondary to gunshot wound." *Id*.  Dr. Glick agreed that Plaintiff would benefit from arthroscopic surgery in view of "the history of swelling, locking, and pain and the positive MRI scan."  *Id*.  Dr. Glick noted that he had discussed with Plaintiff that he might not have complete relief because of the arthritis and could have some residual aching and discomfort and need for additional surgery.  *Id*.

Plaintiff saw Dr. Williams again on June 23, 2011.  *Id.*  at 51.  The administrative note prepared by Edward Gostkowski, PA-C included Dr. Williams' recommendation for arthroscopic surgery for a partial menisectomy.  *Id*. at 51.  The new MRI requested by Dr. Williams was done on July 7, 2011.  *Id*. at 50.  The MRI revealed:

> A small effusion.  There is tricompartmental degenerative change is seen as joint space narrowing and osteophytes with cartilage loss.  This is most severe involving the medial knee joint compartment where there is considerable joint space loss subchondral sclerosis osteochondral defects and subchondral cystic change.  Chronic tears anterior and posterior horn medial meniscus is present.  Cruciate and collateral ligament are intact. Quadriceps and patella tendon is intact.

*Id*. at 68.

Plaintiff had arthroscopic surgery on August 24, 2011.  (Dkt. No. 92-6 at 75.)  According to the discharge summary:

> Arthroscopic surgery showed primarily arthritic change involving primarily the medial femoral tibial joint space.  Erosion of the tibia was noted, and a significant erosion of the femur, and irregularity from the bullet wound were noted.  The patella and lateral joint

were all intact.  A chondroplasty was performed, shaving the
cartilage, removing any large flaking pieces of cartilage that may
cause instability.  The meniscus was probed and found to be intact.

*Id.*

## II.    PROCEDURAL HISTORY

Plaintiff named Norwood and Watts as defendants in his original Complaint.  (*See* Dkt.

No. 1.)  He also named "Jane and/or John Doe[s], Member[s] of the Northeast Region Utilization

Committee" as defendants  *Id*. at 1.  Seon-Spada and Defendant Manenti, both of whom fell

within Plaintiff's Jane and/or John Doe description, were not specifically named in Plaintiff's

original Complaint.  *Id.*

Plaintiff moved for and was granted leave to file an amended and supplemental complaint

naming Seon-Spada and Dr. Manenti as defendants after learning that they were two of the

John/Jane Does.  (Dkt. Nos. 31 and 36.)  Plaintiff timely filed his Amended Complaint adding

BOP, Seon-Spada, and Dr. Manenti as defendants.  (*See* Dkt. No. 37.)  Defendants BOP, Dr.

Manenti, Norwood, Watts, and Seon-Spada  thereafter filed a motion to dismiss Plaintiff's

Amended Complaint.  (Dkt. Nos. 42, 49.)  Plaintiff's official capacity claims against Defendants

Dr. Manenti, Federal Bureau of Prisons, Seon-Spada, Norwood, and Watts for violation of his

Eighth Amendment right to adequate medical care were dismissed without leave to replead for

lack of subject matter jurisdiction by the Hon. Lawrence E. Kahn, D.J., No. 9:10-CV-1013

(LEK/TWD), 2013 WL 375537, 2013 U.S. Dist. LEXIS 12313 (N.D.N.Y. Jan. 30, 2013)

(adopting report and recommendation by Dancks, M.J.).  Judge Kahn also dismissed Plaintiff's

claim against Seon-Spada in her individual capacity for failure to state a claim without leave to

replead, and his individual capacity claims against Norwood and Harrell with leave to replead.

*Id.* Plaintiff did not replead.[4] Defendant's motion to dismiss for failure to state a claim and on qualified immunity grounds was denied. *Id.*

## III.    APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-252 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). The nonmovant must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment. *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue

---

[4] This Court ordered Plaintiff to file an amended complaint repleading against Norwood and/or Watts by May 22, 2013. (Dkt. No. 76.)

of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Salahuddin v. Coughlin*, 999 F. Supp. 526, 535 (S.D.N.Y. 1998) ("pro se parties are to be given special latitude on summary judgment motions.") (citations and internal quotation marks omitted). However, "a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[5] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV.   ANALYSIS

### A.   Plaintiff's Claim Against Defendant

Plaintiff contends that Defendant showed deliberate indifference to his serious left knee problems in denying Dr. Mina's recommendation that Plaintiff have arthroscopic knee surgery. (Dkt. No. 1 at ¶¶ 61, 63-80.) Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). Prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.*

---

[5] Copies of unpublished decisions cited herein will be mailed to Plaintiff as a *pro se* litigant. *See Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

(citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

A claim that prison officials have intentionally disregarded an inmate's serious medical needs has both objective and subjective elements. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009). "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Id*. at 72. (citation and internal quotation marks omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted).

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *Chance v. Armstrong*, 143 F.3d 698*,* 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Id*. at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). "Deliberate indifference requires more

than negligence but less than conduct undertaken for the very purpose of causing harm."

*Hathaway*, 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976). Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.*; *see also Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference.

An MRI done slightly more than a year before Defendant denied the request for the arthroscopic surgery on Plaintiff's knee, revealed "considerable degenerative type abnormality in the medial knee joint compartment seen as loss of joint space, osteochondral irregularity and defects, osteophytes change, subchondral sclerosis and degenerative tears involving anterior and posterior horn of medial meniscus." (Dkt. No. 92-5 at 59.) In September of 2009, Mina, the consulting orthopedic surgeon who had recommended the surgery noted a history of pain, locking, and buckling of Plaintiff's knee and made a provisional diagnosis of "tears of anterior

and posterior medial meniscus of left knee with possible loose osteochondral fragment." *Id*. at 53, 59, 79-80, 82.

While knee injuries have not been categorically ruled out as a possible basis for an Eighth Amendment claim, as Magistrate Judge David E. Peebles noted in *Moody v. Pickles*, No. 9:03-CV-850 (DEP), 2006 WL 2645124, at *6, 2006 U.S. Dist. LEXIS 69148, at *23 (N.D.N.Y. Sept. 13, 2006), a case involving some moderate joint effusion, a meniscal tear and some bone contusion, "[C]ourts in this circuit have almost uniformly found similar knee injuries to be insufficient to trigger Eighth Amendment protection and to support a deliberate indifference claim." *See, e.g., Johnson v. Wright*, 477 F. Supp. 2d 572, 575-76 (W.D.N.Y. 2007) (torn meniscus not sufficiently serious to give rise to a constitutional claim), *aff'd*, 324 F. App'x 144 (2d Cir. 2009); *Williamson v. Goord*, No. 9:02-CV-00521 (GLS/GHL), 2006 WL 1977438, at * 9-16, 2006 U.S. Dist. LEXIS 46828 (N.D.N.Y. July 11, 2006) (injuries, including arthrosis, degenerative joint disease in both knees, and a partially torn anterior cruciate ligament, did not impose the risk of death or degeneration, or inflict severe pain sufficient to satisfy the serious medical test); *Taylor v. Kurtz*, No. 00-CV-700F, 2004 WL 2414847, at *1-4, 2004 U.S. Dist. LEXIS 27925 at *12-13 (W.D.N.Y. Oct. 28, 2004) (complaint of failure to perform knee surgery for nine months after determining plaintiff had torn a previously repaired anterior cruciate ligament, a torn lateral meniscus, and degenerative arthritis found not sufficiently serious to satisfy the Eighth Amendment standard); *Espinal v. Coughlin*, No. 98 CIV. 2579 (RPP), 2002 WL 10450, at *1-5, 2002 U.S. Dist. LEXIS 20, at *11-14 (S.D.N.Y. Jan. 3, 2002) (ruptured anterior cruciate ligament did not constitute a severe injury for purposes of the Eighth Amendment despite a three-year delay in performing surgery while more conservative treatment

was attempted).

The summary judgment record establishes that Plaintiff's knee problems as diagnosed pre-surgery do not differ significantly from those found insufficiently serious for Eighth Amendment purposes in other cases dealing with knee injury claims. While the medical records acknowledge Plaintiff's chronic knee pain on a number of occasions, the sole evidence that the pain Plaintiff suffered was extreme, so as to potentially qualify his knee problems as a serious medical condition, are Plaintiff's conclusory assertions to that effect. (Dkt. Nos. 37 at ¶ 16; 89-1 at ¶ 22; 92-6 at 25, 41.) Furthermore, in his Amended Complaint, Plaintiff alleged that the pain was extreme only during sudden episodes of jamming of the knee, which occurred about once a month. (Dkt. No. 37 at ¶¶ 16, 23.)

Even if Plaintiff could be found to have had a serious medical condition based upon his complaints of chronic and extreme pain and jamming and buckling of his knee, the record establishes the absence of deliberate indifference on Defendant's part. In *Pagan v. Correctional Medical Services*, No. 11 Civ. 1357 (ER), 2013 WL 5425587, at *12-13, 2013 U.S. Dist. LEXIS 140112, at *36-37 (S.D.N.Y. Sept. 27, 2013), in which defendants were awarded summary judgment on plaintiff's claim arising out of an alleged delay in surgery for a torn meniscus, the district court noted that "Courts in this circuit have found that delay in providing surgery for knee injuries such as the one at issue here are insufficient to support a § 1983 claim for deliberate medical indifference."[6] (citing *Espinal*, 2002 WL 10450; *Taylor*, 2004 WL 2414847) *see also*

---

[6] The constitutional standard of review for *Bivens* actions is the same as for claims brought under 42 U.S.C. § 1983, *Tavarez v. Reno*, 54 F.3d 109, 110 (2d Cir. 1995), and there is a "general trend in the appellate courts to incorporate § 1983 law into *Bivens* suits." *Chin v. Bowen*, 833 F.2d 21, 24 (2d Cir. 1987) (citation and internal quotation marks omitted).

*Culp v. Koenigsmann*, No. 99 Civ. 9557 (AJP), 2000 WL 995495, at *4, 9-10, 2000 U.S. Dist. LEXIS 10168, at *7 (S.D.N.Y. July 19, 2000) (no Eighth Amendment claim where plaintiff suffered from a torn meniscus and experienced a one-year delay from injury to surgery); *Sharp v. Jeanty*, No. 93 Civ. 0220 (PNL), 1993 WL 498095, at *2, 1993 U.S. Dist. LEXIS 16780, at *4 (S.D.N.Y. Nov. 30, 1999) (dismissing § 1983 deliberate indifference claim where plaintiff's medical records indicated "extensive and ongoing course of medical treatment" of his knee injury).

Medical records submitted by the parties, along with Plaintiff's contemporaneous hand-written notes regarding his treatment (Dkt. Nos. 89-1 at ¶ 17; 96-3 at 45-55), establish that Plaintiff received ongoing medical care, including pain medication, for his knee problems from the time he saw Navarro in February of 2008 until August of 2011 when he had the knee surgery that had been approved by Seon-Spada on February 23, 2011. During that period, Plaintiff also had recommended diagnostic testing in the form of multiple x-rays and MRIs. (Dkt. Nos. 92-5 at 48, 59, 82; 92-6 at 50; 96-3 at 51.)

Plaintiff believes he should have had arthroscopic surgery at the time the recommendation for surgery to repair the torn meniscus was made by Dr. Mina.[7] However, a mere disagreement as to the medically proper course of treatment is not a sufficient basis for a deliberate indifference claim. *See Chance*, 143 F.3d at 703. An inmate does not have the right to treatment of his choice. *See Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). "[D]eliberate indifference [will not] be found when an inmate simply prefers an alternative treatment or feels

---

[7] When Plaintiff ultimately had the surgery, the meniscus was found to be intact. (Dkt. No. 92-6 at 75.)

that he did not get the level of medical attention that he desired." *Cherry v. Edwards*, No. 01 Civ. 7886 (FM), 2005 WL 107095, at *8, 2005 U.S. Dist. LEXIS 702, at 22-23 (S.D.N.Y. Jan. 18, 2005) (citation omitted), *aff'd*, 155 F. App'x 529 (2d Cir. 2005).

In this case, outside orthopedic surgeon Dr. Mina recommended the surgery that Defendant disapproved. The evidence reveals that Dr. Mina's recommendation, made as a result of September 17, 2009, and October 29, 2009, examinations and review of records, was the only recommendation made prior to Defendant's disapproval.[8] (Dkt. No. 92-5 at 82.) The law is clear that "a difference of opinion . . . among medical professionals . . . as to the appropriate course of medical treatment does not in and of itself amount to deliberate indifference." *Williams v. M.C.C. Inst.*, No. 97 CIV. 5352 (LAP), 1999 WL 179604, at *7, 1999 U.S. Dist. LEXIS 3871, at *21-22 (S.D.N.Y. Mar. 21, 1999) (citing *Ross v. Kelly*, 784 F. Supp. 35, 45-46 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 2002)); *see also Cole v. Goord*, 04 Civ. 8906 (GEL), 2009 WL 1181295, at *6-9, 2009 U.S. Dist. LEXIS 37088, at *23 (S.D.N.Y. Apr. 30, 2009) (prison doctor's disagreement with outside specialist about inmate's course of treatment, including the inmate's need for surgery and proper medication does not establish deliberate indifference), *aff'd*, 379 F. App'x 28 (2d Cir. 2010); *Woods v. Goord*, 01 Civ. 3255 (SAS), 2002 WL 31296325, at *5, 2002 U.S. Dist. LEXIS 19371, at *17-18 (S.D.N.Y. Oct. 10, 2002) ("An Eighth Amendment

---

[8] Plaintiff claims that he was told by Dr. Ball, who examined his knee in Ortho on April 23, 2008, that he would need arthroscopic surgery. (Dkt. No. 96-2 at ¶¶ 4-5.) However, the medical records submitted on the parties' motions are devoid of any opinion to that effect or recommendation for surgery by Dr. Ball. (*see* Dkt. No. 95-2 at 55-57.) Therefore, even if as Plaintiff claims, Dr. Ball dictated his diagnosis and recommendation into a hand held recorder, there is no evidence that the recommendation found its way into Plaintiff's medical records. (Dkt. No. 96-2 at ¶ 5.) Moreover, even if Dr. Ball had included an opinion that Plaintiff needed surgery in Plaintiff's medical records, a difference of opinion with Defendant would not be enough to show deliberate indifference.

claim for deliberate indifference cannot be based on any difference of opinion among doctors.").

While it appears from the allegations in Plaintiff's Amended Complaint that Defendant might have disapproved the surgery solely based on InterQual®, without regard to Plaintiff's medical history or the merits of Dr. Mina's recommendation, the summary judgment record establishes that Defendant reviewed and considered Plaintiff's medical records in conjunction with InterQual® in disapproving the surgery. (Dkt. Nos. 89-2 at ¶ 23; 92-6 at ¶¶ 11-12.) According to Defendant, all relevant portions of InterQual® are reviewed in total, not piecemeal, when evaluating whether a medical request meets the InterQual® criteria. (Dkt. No. 89-2 ¶ 26.) When he compared all of the facts related to Plaintiff's condition against all of the necessary criteria to be weighed under the InterQual® Procedures, Plaintiff's request for surgery did not meet all the criteria because of a failure to exhaust more conservative treatment methods. *Id*. at ¶¶ 2, 23. Furthermore, Defendant contends that range of motion exercises are often useful in alleviating the symptoms and increasing the comfort level of patients with knee injuries like Plaintiff's. *Id*. at ¶¶ 18-19.

Even if Defendant applied the InterQual® Procedures incorrectly, as Plaintiff claims, there is no evidence suggesting that his doing so was anything more than an inadvertent failure, which does not constitute deliberate indifference.[9] *See Estelle,* 429 U.S. at 105-06. There is no evidence that Defendant's disapproval of Plaintiff's knee surgery "involve[d] culpable

---

[9] Plaintiff claims that his knee problems more than amply met the criteria under Interqual® Sections 100 and 600, entitled "Removal of intra articular loose body" and "Resection/Repair of unstable meniscal tear," respectively, both of which would have allowed for the surgery, rather than Section 700, entitled "Resection/repair of stable meniscus tear by Sx/findings," which called for physical or occupational therapy before surgery was appropriate. (Dkt. No. 96 at 7-8.)

recklessness, i.e., an act or failure to act . . . that evince[d] a conscious disregard of a substantial

risk of serious harm." *Chance*, 143 F.3d at 703 (citation and internal quotation marks omitted).

Moreover, this case is distinguishable from *Hathaway v. Coughlin*, 841 F.2d 48, 50-51

(2d Cir. 1988), in which the Second Circuit found a question of fact as to deliberate indifference

where major surgery to correct broken pins in plaintiff's hip was delayed for two years. There is

no basis in the evidence for concluding that Plaintiff's knee surgery would qualify as major

surgery, particularly in light of the case law cited herein involving knee injury claims.[10]

In light of the foregoing, I recommend that Plaintiff's amended motion for summary

judgment (Dkt. No. 89) be denied, and Defendant's motion for summary judgment be granted.

(Dkt. No. 92.)

### B.  Plaintiff's Claims Against Defendants Jane/John Does, Members of the Northeast Region Utilization Committee, Federal Bureau of Prisons

In his Amended Complaint, Plaintiff alleged that Defendants Jane/John Does, Members

of the Northeast Region Utilization Committee ("Committee"), were responsible for the denial of

his knee surgery and indeed, the December 2, 2009, notice of disapproval identified the

Committee as having made the decision. (Dkt. No. 92-6 at 22.) Plaintiff's numerous attempts to

obtain the names of the members of the Committee from BOP employees and officials were

allegedly rebuffed. (Dkt. No. 96-3 at 49-52.) Plaintiff was able to identify Seon-Spada and

Defendant Manenti, who were substituted for two of the Jane/John Does, as alleged members.

Defendant has denied that the Committee exists, without explanation as to why the denial

_____

[10] There is no evidence of involvement by Defendant in Plaintiff's care after he
disapproved the surgery. Much of the delay in Plaintiff's knee surgery after the initial denial can
be attributed to factors such as Plaintiff's post-denial delay in seeking treatment for the knee as
well as his move from Ray Brook to Fort Dix. (Dkt. No. 37 at ¶¶ 31, 38.)

was attributed to a non-existent Committee, and the only evidence to the contrary is the disapproval of surgery itself. (Dkt. No. ¶¶ 3-6.) Furthermore, Defendant has admitted that it was he who made the decision to disallow the surgery. (Dkt. No. 92-6 at ¶ 10.) Therefore, the Court recommends that Plaintiff's Amended Complaint be dismissed as against any as yet unidentified Jane/John Doe Defendants sued as members of the Committee, without leave to amend, pursuant to 28 U.S.C. § 1915(e)(2)(B).

**ACCORDINGLY**, it is

      **RECOMMENDED** that Plaintiff's amended motion for summary judgment (Dkt. No. 89) be **DENIED**; and it is further

      **RECOMMENDED** that Defendant's motion for summary judgment (Dkt. No. 92) be **GRANTED**; and it is further

      **RECOMMENDED** that Plaintiff's Amended Complaint (Dkt. No. 37) be dismissed as against any as yet unidentified Jane/John Doe Defendants, without leave to amend, pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is hereby

      **ORDERED** that the Clerk provide Plaintiff with copies of the following unpublished decisions cited herein: *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 (S.D.N.Y. Oct. 28, 1999); *Moody v. Pickles*, No. 9:03-CV-850 (DEP), 2006 WL 2645124 (N.D.N.Y. Sept. 13, 2006); *Williamson v. Goord*, No. 9:02-CV-00521, 2006 WL 1977438 (N.D.N.Y. July 11, 2006); *Taylor v. Kurtz*, No. 00-CV-700, 2004 WL 2414847 (W.D.N.Y. Oct. 28, 2004; *Espinal v. Coughlin*, No. 98 CIV. 2579, 2002 WL 10450 (S.D.N.Y. Jan. 3, 2002); *Culp v. Koenigsmann*, No. 99 Civ. 9557, 2000 WL 995495 (S.D.N.Y. July 19, 2000); *Pagan v. Correctional Medical Services*, No. 11 Civ. 1357 (ER), 2013 WL 5425587 (S.D.N.Y. Sept. 27,

2013); *Sharp v. Jeanty*, No. 93 Civ. 0220 (PNL), 1993 WL 498095 (S.D.N.Y. Nov. 30, 1999);

*Cherry v. Edwards*, No. 01 Civ. 7886 (FM), 2005 WL 107095 (S.D.N.Y. Jan. 18, 2005);

*Williams v. M.C.C. Inst.*, No. 97 CIV. 5352(LAP), 1999 WL 179604 (S.D.N.Y. Mar. 21, 1999);

*Cole v. Goord*, 04 Civ. 8906 (GEL), 2009 WL 1181295 (S.D.N.Y. Apr. 30, 2009); and *Woods v.
Goord*, 01 Civ. 3255(SAS), 2002 WL 31296325 (S.D.N.Y. Oct. 10, 2002).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file
written objections to the foregoing report.  Such objections shall be filed with the Clerk of the
Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL
PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing
*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);
Fed. R. Civ. P. 72, 6(a).


Dated: January 13, 2014
      Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge